Good morning Your Honor, Guadalupe Garcia. Okay, and Steltzer? Good morning Your Honor, it's Rob Steltzer for the AG. Okay, so we're good to go on the first one. Our first case for argument this morning, good morning everyone, welcome to Virtual Ninth Circuit here. Our first case for argument is Hernandez-De Santana v. William Barr. So Ms. Garcia. Thank you, good morning Your Honor. Guadalupe Garcia, may I please the court, Guadalupe Garcia, I represent petitioners Mirian Hernandez-De Santana and her son Ivan. With the court's permission, I would like to reserve three minutes for rebuttal. Yes. Thank you. Your Honor, Ms. Hernandez and her son fled El Salvador in 2015, following years of abuse that Ms. Hernandez suffered at the hands of her husband. She credibly, the immigration judge found her credible when she testified. Her husband burned her with an iron, lit her on fire, raped her on two occasions, subjected her to ongoing physical and verbal abuse during the marriage. I believe this is in the car at pages 201 through 205. Let me ask you this, let me ask you this since we don't have a lot of time. I know that we've all reviewed everything. It seems to me that what the agency found was that the petitioner was able to leave her husband. And so why is it not reasonable in light of petitioner's testimony concerning the number of times that she left her husband or that her husband left her? So it seems to me that if that's supported by the agency, then we don't even get to the social group. Yes, I understand. I believe Your Honor, the immigration judge erred when she considered that leaving the relationship was not part of the cycle of violence. I would argue that based on the article submitted of the numerous articles submitted for the country of El Salvador, it would support the fact that this is a very common cycle of being in domestic violence. But doesn't her husband live with some other woman and have children with some other woman at this point? At the end of the relationship, and again, I would argue that this would support the petitioner's argument, where although he had another relationship with another child, he still considered her her property. And she testified in court that he would come at any time enter her home, even though he was living with somebody else and had another child, and told her, I can come whenever I want, I can do whatever I want, and because she was married to him and she was adopted. All right, but we're not deciding it in the first instance. So tell me, what is the standard of review of the agency's findings of fact here? Your Honor, well, I believe the Ms. Hernandez presented her argument. I mean, do you concede that we decided in the first instance? I'm sorry, Your Honor. I cut you off. Okay, do you concede that we do not decide it in the first instance? So we have some standards of review. So tell me what they are. Your Honor, I believe the court, the Ninth Circuit, can only review the Board of Immigration's decision, wherein the only reason the appeal was dismissed was because of the change in law. Because ARCD, which she relied on at the time she submitted her application, and by the time, which still existed when the briefs were submitted, has now been overruled. But that's not entirely true because the BIA said, found that she could leave her husband, so then they didn't even really get to the social group. So if that's supported by substantial evidence, then does it really even matter what the social group is? Because she's not in that social group as defined. Well, I would argue that in the present, I mean, when she, I would argue that at the time she filed, the argument would be if ARCIG had not been overturned by Matter-AB, the argument before the court would be the judge erred in denying and finding that she was not part of the social group. At this point, her ARCIG has been overruled. I think the social group would be better for you because it sounds like AB is worse for you. Well, I'm sorry, can you repeat the question, Judge? All right, so if you're saying that the social group now would be defined differently, does the Attorney General's opinion in the matter of AB undermine recognition of the petitioner's proposed social group completely? I would state that it does not because part of her social group, I would argue, is also gender-based in the fact that she is a woman in El Salvador. Ms. Garcia, let me ask you this. The BIA did not decide the social group, isn't that correct? They just assumed that she was a member of a protected group, isn't that right? I would agree. Or that the group that they identified was cognizable, but what they found was that she was not a member of that group because she was able to leave her husband, isn't that right? I would agree, yes. Okay, now, Judge Callahan, on the standard of review, what Judge Callahan was referring to is that when we look at the factual record, our review is for substantial evidence and we can only overturn the BIA's, the agency's decision if the evidence compels a contrary conclusion, correct? Correct. All right, so as I read the record, the agency's determination, the BIA, they pointed, as Judge Callahan pointed out, they pointed to the periods of separation. I believe it was she got a restraining, somebody got a restraining order against her husband, if I'm not mistaken. Well, there was another ground, I guess when the police were involved, or the family support, I'm sorry, the family support. So what is it about the factual record here that compels a contrary conclusion to the one reached by the agency, by the BIA? I mean, there were periods, there were at least with respect to separation and his continual contact with her, it's all part of the cycle of domestic violence, as we recognized in Hernandez. Correct. Earlier Hernandez decision, is that right? Yes, Your Honor. So if we were to, if we were to agree with you, it would go back to the agency, isn't that right? Yes, Your Honor. And the agency would then take up the issue of AB and whether AB, what, what, what's this, how does it, would then decide how AB affects this case. They never resolved that question. Is that right? I would agree with you, Your Honor. Correct. Yes, Your Honor. That would be our position also. Can I ask you about the mediation? Because you asked for mediation and said that it wasn't, that the other side didn't have a problem with it, and then the other side jumped in and said that they did. What was that situation? Your Honor, I did, I wasn't the attorney who briefed the matter. My intent was to reach out to the agency earlier. Unfortunately, things went downhill really quickly in the last couple, last month or so. And I reached out to the agency. I did, I was speaking with Attorney Welhaff, who was assigned to the case previously. She indicated that she would not be opposed to mediation. And I, and that's how, why I prepared and we submitted the motion. Unfortunately, after it was submitted, she informed, oh no, I'm sorry, she informed us that I guess she had been overruled by, I don't want to misstate, maybe someone above her, and that she had to file a motion opposing the prior agreement. Okay. So there's a, there's also a CAT claim here, is that correct? Yes, Your Honor. So, so what, in essence, what's, what's your position on that? Well, Your Honor, on the CAT claim, I would argue that rape and attempted murder, which she is, you know, he showed up with a gun to her home at one point, and the police didn't even come out to arrest him. I would argue that these clearly rise to the level of past torture, that the evidence, as well as the fact that a three-month restraining order for someone who was sexually assaulted, you know, the husband shows up with, with a gun, which I would argue in the United States would rise to attempted murder, terrorist threats, assault with a deadly weapon. He receives only a three-month restraining order. Make clear that the Salvadorian government is likely to acquiesce. That restraining order was not sought by her, correct? It was sought by someone else. No, it was, it was sought by her because even though they had that incident where the, I believe the cousin went to the police department to report it because she was very afraid to, instead of the police coming to her home, they said that she had to go to the police station to make the report because she was the victim. And that's how, and, and, and in the test, in the record before the immigration judge, she testified that she informed the judge of the past abuse of what had taken place, what she had suffered, and only a three-month restraining order was issued. Okay. Well, I'll give you a minute for rebuttal. Let's hear from the government. Thank you. Good morning, Your Honors. Counsel, can you hear me? Yes. Yes. All right. And may it please the court, my name is Rob Stalzer and I'm here on behalf of the Attorney General. Your Honors, the record here does not compel the conclusion that Ms. Hernandez demonstrated eligibility for asylum or withholding, withholding under the CAT, uh, treating. Uh, quite simply, she, she was, she had the opportunity to propose a particular social group and the board assumed its existence. Uh, now subsequent developments may, may have changed to that, but, but here we can simply assume that that group exists of, of women, um, domestic violence victims who cannot leave their, uh, partners in El Salvador. The problem was that Ms. Hernandez demonstrated that she was able to leave her partner, unlike the alien in matter of, in her case. Let me ask you this. I guess an argument can be made that cyclical behavior of battering separation and reconciliation is textbook domestic violence. It appears that the IJ didn't recognize that at all. Why shouldn't this matter be remanded to the agency to consider this argument? Uh, because I think the IJ, the immigration judge was aware of the cyclical nature of it and pointed out that petitioner managed to break that cycle. You know, unlike a lot of, um, women in these, uh, in these, in these abusive relationships, she was able to seek protection from the courts. She was able to seek protection from the police, her neighbors and her friends. I mean, one of the things in ARCG that was so important was that in that case, the society, her family, her friends kept telling her in ARCG, Hey, this is a matter for your marriage. This is a marital issue and we won't get into it, but that's not what happened here. Here. People actually helped her and she was able to leave her husband and ultimately tell him, I'm not just leaving you, I'm taking your kid and she sued for custody and she won. Doesn't this have all the signs of, of the classic cycle of, of, of domestic abuse that we recognized in Hernandez and earlier Hernandez case? Right, right. It does have, well, obviously, yes, she's an abused woman. It has, it has those features, but she was able to leave him, which means that's part of the cycle. They're able to, you know, they get away and then the abuser comes back. It's, you know, it's repeated and it's demonstrated in this record. Right, right. I hear you, your Honor. What I mean to say is not that she was able to leave him and then he came back, she was able to leave him and then he didn't come back. She was able to leave him and then he gave up and he took up a relationship with another woman. As I understood the record, the only time he was able, he didn't come back is when, was when there was the, the, the temporary restraining order that lasted for three months. When he was trying to be a good man, he was a bad guy because of the judge, the custody or, or the family dispute proceedings in court. I think there was a custody issue in play with this judge as well. But when the, when the restraining order expired, he was right back at his old antiques. He, he was back, but the, he did not move in with her. The domestic relationship did not resume. So, what is your position on the, I heard that there was a situation of mediation talked about. What's your position on that? Yeah, my colleague, so I had this case for briefing and then my colleague was assigned it for argument and she got mixed up as to what she, what she was agreeing to when she was called and heard about this mediation. And that's, that's when the case was reassigned back to me and simply mediation just isn't going to help in this case, your honor. And that's why we reversed on that thing. Oh wait, no, we didn't mean to acquiesce to mediation. There's no, this case is ripe for a decision because there's nothing here to mediate. The particular social groups were thoroughly discussed below and it's not, there just wasn't, there was no other option there. And I didn't want to waste the court's time with going through a round of mediation to come to the conclusion that, well, actually this case is ripe for a decision. Let me ask you this. If we were to disagree with the agencies, if we were to conclude otherwise, that, that the, that, that the record evidence compels a contrary conclusion, it would go back to the agency and what would be on, in play? At that point, what would be in play would be all of the, well, really all of the elements of asylum would still be in play. We'd be wanting to know, first of all, is it a cognizable social group? Is she a member of the group? Is the country unable and unwilling to protect her? Because of course, when we're talking about a third party asylum claim, a third party persecutor, you know, we, we have to look for some state involvement or acquiescence. All of those elements would be back in play if we were remanded to look at whether she demonstrates eligibility for asylum. Is AB more favorable to her or less favorable to her? I'm not sure whether, I've been thinking a lot about matter of AB since you guys asked to prepare for it, and I'm not sure whether it helps her or hurts her. In a matter of AB, it says that generally domestic violence, the case alone isn't going to get you to asylum, but it didn't foreclose these claims completely, right? So if she can bring in much enough evidence that she actually belongs to a particular social group that's defined with particularity and social visibility, that has this immutable characteristic that she cannot get out of it because her society says she cannot, you know, leave her husband. Well, then I think that group might still be cognizable even under matter of AB. I don't think that she demonstrated, in this case, for the reasons that the board already stated, that she was able to break the cycle of violence, that she was able to finally quit him and make him leave her alone. Then as a result, she was able, she was eligible for asylum. And I think, by the way, I want to focus the court's attention on the fact, the reason we're inquiring into that, why do we care that this is an immutable trait, that society is not letting her leave her husband? The answer to that question is because asylum is reserved for people who cannot get the help from their government. Can you slow down a little? I'm sorry, I'm sorry. Stop, stop, stop. Can you slow down a little bit? Because we're appearing by phone, I know you're excited and you're, can you just go back and slow down a little? Start that last slide. I apologize. I'm sorry, I'm a very fast talker. I know, I always go by the court reporter, slow down, slow down, but it's, just go back and start that last argument you're making again slower. Yes, Your Honor, I will. All right, what I was saying was that I wanted to focus the court's attention on the idea that asylum is reserved for people who cannot seek the help of their own country, either because the country is persecuting them, or because they can't stop the persecutor. And that's why, in a case like this, the thing we're looking at, in terms of the particular social group, is whether it's immutable, whether she was actually able to leave the husband, or unable to leave the husband, or the abuser, because society won't let her, because the police won't help her, because her family and friends tell her, hey, that's part of your marital relationship and you just have to deal with it. That's what we look for in a case like this. And here, I know Petitioner has pointed to record evidence showing that many women in But that wasn't Petitioner's experience. Unlike a lot of these women, she was able to go to the police. She was able to go to the courts and win custody of her child. She was able to, her family helped her, neighbors helped her on one occasion. In other words, it's just, this is an immutable situation where her society won't defend her, and that she is therefore eligible for asylum. That's why the board looked at it this way, and asked, are you actually a member of this group? And the answer was no. Well, let's say if you are a person that, because, there are a lot of women in this country that one would say, it's not that our system condones domestic violence, and they can get restraining orders, they can do a lot of things, and it's, but there are people from their own minds that they can't seem to get out of it. Are you saying that that isn't enough? Even if in her own mind she doesn't feel like she can get out of it, we have to look outside of that. I guess I'm hearing you ask us to look outside of her mind. I don't think we, no you're right, I don't think we need to look outside of her mind. She testified specifically that she was no longer listening to him. I was no longer listening to him. I was going to leave him, and I think he noticed that I was no longer intimidated by him, which is why he let me go. That was her testimony at page 147 of the record, your honor. In other words, like I said before, it's not just that she managed to leave him, she managed to leave him and quit him. He kept coming back, though, even up to, right until the time that she left. He did, but she didn't say he kept coming back. When she was living with her parents. Right, while she was living in her parents' home, her parents at that point had immigrated to the United States. But he didn't move back in with her, and he didn't resume the physical abuse, he simply wanted to see the kid, and she ultimately said, no, you can't see the kid, and in fact I'm moving to the United States. Could you, you only have just a few minutes left, do you want to address the cat claim? Yes, with regard to the torture claim, your honor, I would simply say that to be eligible for torture, you have to demonstrate that a public official would acquiesce to this. There's no indication in the record here at all that the police would be fine with her husband torturing her or raping her or killing her. They did come to her aid when she asked. Now, she didn't always ask, and I understand that's a really hard thing to do in a domestic relationship, but the evidence that we have before us shows that when she did seek aid, she got it. Which means that the police are not going to, she did not demonstrate that it was more than torture. Okay. Anything else? Thank you for your time, your honors. Thank you. No, thank you for your time. Okay. Ms. Garcia, Ms. Garcia? Yes. You had a minute. Yes. Thank you. Very briefly on two points. I would disagree, I would respectfully disagree with counsel that the judge did address the cycle of abuse. I don't believe that that was addressed in this matter at all, and I don't think that it should be assumed that the judge did. I think that the captain was actually very concerned about him leaving the country, and based on the record, even when he was living with somebody else, he continued to return. She needed his permission to leave the country and she had to lie to even obtain that from him. And again, I would argue the police did not protect her. The testimony says they came to look for him. He fled, and they never again even looked for him to arrest him for showing up with a gun and threatening her. And then when they didn't even come out to take a report, they required her, the victim who's seeking help, to come in and request it. Briefly, on the cap claim, I respectfully disagree. I believe there's enough evidence that the police did not come to her aid for the reasons I just stated. Thank you. All right. Thank you. Thank you, counsel. We appreciate your arguments and your willingness to work with us on this virtual report. Thank you. Thank you. The matter is submitted. Thank you.
judges: Paez, Callahan, Lynn